### C. V. HILL & CO. v. INTERSTATE ELECTRIC CO. OF SHREVEPORT, Inc.

### No. 6008.

Court of Appeal of Louisiana. Second Circuit.

April 4, 1940.

Rehearing Denied May 3, 1940.

Writ of Certiorari and Review Denied May 27, 1940.

Harry V. Booth and L. L. Lockard, both of Shreveport, for appellant.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellee.

DREW, Judge.

Beginning in January, 1937, plaintiff had an arrangement with defendant whereby it shipped to defendant for sale certain goods

owned by plaintiff, consisting of refrigerators, show cases, meat counters, etc., to be used for industrial purposes. It was agreed that whenever defendant sold any of the goods or wares that it would pay plaintiff the agreed net price within ten days, subject to the usual discount. None of the goods or wares were to be paid for until sold by defendant.

The above arrangement continued until about August 15, 1937, at which time for reasons unexplained plaintiff substituted as its agent or factor one Harrelson, operating under the trade-name of Acme Refrigerating Company of Shreveport, Louisiana. At the time the change was made, defendant had in its possession a quantity of goods and wares which had been shipped to it by the plaintiff, all of which was delivered to Harrelson at the request of plaintiff.

Almost all of plaintiff's products required motors and other additional equipment when installed in order to become a completed unit. It was Harrelson's custom to secure the motors and other equipment from defendant and to make a price on an object as completed and installed. In most instances the total price was paid partly in cash and the remainder in notes secured by chattel mortgage.

A representative of plaintiff, together with Harrelson, made arrangements with the Commercial Credit Company, a credit institution, to finance such sales, if the Credit Company approved them, and to send the entire amount to plaintiff which would deduct its own price and remit the balance to Harrelson, or whoever he directed. The first sale made by Harrelson was not approved by the Commercial Credit Company. They therefore refused to finance the deal. Harrelson then interviewed defendant, who had agreed to furnish the motors and other equipment necessary to complete the units, and a representative of defendant, together with Harrelson, secured the Motor Finance Company, another credit institution, to finance the sale, but only upon both Harrelson and defendant endorsing the notes. All of the funds were paid over to defendant. It deducted the price due for its products, consisting of motors, etc., which were to be put into the job, and credited Harrelson with the remainder. All sales made thereafter by Harrelson were handled in the same manner.

After four such deals were so handled, plaintiff made a demand on defendant for the net price of its equipment involved therein, consisting of goods formerly consigned to Harrelson, amounting to $2,169. After repeated demands by telephone and otherwise, defendant, on November 29, 1937, forwarded its check to plaintiff to cover the amount claimed.

Besides the first four deals above spoken of, there were two other deals made which form the basis of this suit. They were with two men named Viso and Caldwell. The Viso deal was completed October 6, 1937, and the Caldwell deal on January 29, 1938. Both were handled by the Motors Finance Company and all funds paid to defendant. Plaintiff demanded of defendant that it be paid the price of its property which went into the deals, amounting to $1,649.89. Payment was refused and this suit followed.

Plaintiff contends that its goods were in Harrelson's possession on consignment and that title was in plaintiff, and that defendant had full knowledge of this fact and that Harrelson was only an agent of plaintiff; that there was an agreement between Harrelson and defendant that defendant would retain out of the proceeds of each sale the price of its electric motors and other parts furnished, as well as plaintiff's part of the sale, which part it would remit directly to the petitioner and would credit Harrelson's account with the balance; that the arrangement was advantageous to defendant in that it constituted an outlet for the sale of its electric motors and other devices necessary to complete a job; that defendant well knew that any funds which came into Harrelson's hands by virtue of a sale of this consigned equipment did so as an agent of plaintiff and that he was charged with the trust of transmitting it directly to plaintiff. It further alleged that defendant knew that plaintiff's goods to the value claimed here were included in the Viso and Caldwell jobs.

Defendant denied there existed between it and plaintiff, prior to August 15, 1937, any consignment status or that it was the agent of plaintiff at that time. It denied that plaintiff's merchandise was in possession of Harrelson on consignment or that he was plaintiff's agent. It also denied that it had any knowledge of any limitation or lack of title in Harrelson. It contends that it dealt with Harrelson as owner of the goods and denies that it had any agreement with Harrelson to remit to plaintiff for the price of its goods.

Defendant also admits that it paid plaintiff for the four jobs sold prior to the two involved here, but that it paid out of funds belonging to Harrelson and at his direction or request.

The lower court rejected the demands of plaintiff and it is now prosecuting this appeal.

It is argued in this court that the character of the transaction involved did not constitute a consignment of merchandise in the true sense, but was in the nature of "sale or return" in which title passes at once to the buyer. Defendant further contends here that if this contention is correct, further discussion of the case is unnecessary. We will therefore pass on and dispose of this question first.

 Sections 592 and 593, Corpus Juris, Volume 55, deals with the subject in the following language:

"Sale or Return. A sale or return, or a contract of sale or return, is in the nature of a sale with an option to return, or a sale on condition subsequent. It is to be distinguished from an option to purchase, a sale on trial or approval, and a bailment. Where property is delivered under a contract of sale or return, the title passes at once to the buyer in a majority of jurisdictions, unless it appears that the intention is that the title shall remain in the seller, as where payment of the price is made a condition precedent to the passing of title; and while the title of the buyer will be divested by a timely exercise of the option to return, it remains in him less, and until, he exercises the option and returns or redelivers the property to the. seller. However, under the statutes of a few jurisdictions, and the construction placed thereon, the title passes at the same time as in the case of a sale on approval, namely, when the buyer signifies his approval or acceptance to the seller, or does any other act adopting the transaction, unless a different intention appears.

"Consignment for Sale. Ordinarily where goods are consigned by one person to another for sale by the latter, the title thereto remains in the consignor; but whether the consignee is to be considered as a buyer or agent depends on the intention of the parties, and on the real nature of the transaction rather than the language which the parties may have employed. Where the transaction is such that the consignee acquires complete dominion over the goods with the right to sell them on such terms

and conditions as he may see fit, and is bound to pay the consignor a stipulated price therefor, it amounts to a sale and delivery which passes title to the consignee, and such transfer of title is not affected by the fact that the goods are not to be paid for until resold by the consignee, or that he has an option of returning the goods which he has not resold. Also, where the consignor clothes the consignee with indicia of title and permits him, without objection, to deal with the property as his own, the consignee may transfer title to a purchaser, which will be good as against the consignor."

In the case of William Frantz & Co. v. Fink, 125 La. 1013, 52 So. 131, our Supreme Court fully discusses "Sale and Return" and the rights of the true owner of the goods.

 Our appreciation of the holding of the court in that case is,—where the owner entrusts his merchandise to the possession of a merchant, artisan or trader engaged in the business of selling a like kind of merchandise for the purpose of sale and an innocent third party purchases the merchandise in the usual course of business and pays for it, the true owner of the merchandise cannot recover it from the purchaser because the merchant, artisan or trader fails to pay the money over to it. He is estopped, regardless of the secret agreement between the owner and the merchant, artisan or trader. On the other hand, if the purchaser has knowledge of the agreement between the owner and the one offering the goods for sale, or if circumstances are such as to arouse the suspicions of a reasonable man as to the true ownership of the goods, the purchaser takes them at his own peril, and if the merchant, artisan or trader fails to pay the true owner for the goods, the owner may recover them from the purchaser.

 To the same effect is the ruling in Aleman Planting & Manufacturing Company v. Hines, 157 La. 625, 102 So. 815. The following syllabus reflects the rule therein: "Ordinary rules of agency have no application, where principal invests agent with all indicia of ownership, and persons dealing in good faith with agent may treat him as absolute owner."

Under the above set out doctrine, it is clear that if this were a suit by plaintiff to recover the merchandise or goods sold by Harrelson. to Viso and Caldwell, it could

not recover for the reason that Harrelson was conducting a public place of business under a trade-name and was displaying for sale, with full authority of the plaintiff, the goods and merchandise which plaintiff had consigned to him for the purpose of sale, and it is not shown that Viso or Caldwell had any knowledge of the contract or agreement between plaintiff and Harrelson and there was nothing to arouse their suspicion that Harrelson was not the owner of the goods. But this is not such a case. The suit is against defendant who is charged with appropriating money due to plaintiff, under contract with Harrelson, to their own use in payment of a debt due defendant by Harrelson. They are charged with full knowledge of the condition under which Harrelson possessed and sold the goods consigned to him by plaintiff. It must be conceded that if Harrelson had sold plaintiff's goods to Viso and Caldwell and collected the money for them, and then voluntarily appropriated that money to his own use by paying it to defendant in settlement of an account he owed defendant, plaintiff could not recover. Article 2138, Revised Civil Code. Those are not the facts of this case.

The contract between plaintiff and Harrelson was one of consignor and consignee. It was so intended and considered by both parties to the contract, and we are convinced that defendant was well informed as to the relation existing between plaintiff and Harrelson and knew that when plaintiff's property was sold by Harrelson, the money received for it was to be paid and should have been sent to plaintiff. The contract defendant had with plaintiff to handle the same goods, later handled by Harrelson, was at least similar in that respect. Harrelson testified that it was the understanding between him and defendant that they were to forward to plaintiff its part of the money due from each transaction. He also approximated the amount due plaintiff in each instance and informed defendant's officers of the approximate amount. This is denied by defendant's officers. We think it certain that Harrelson never at any time authorized defendant to credit his account with the funds due plaintiff from the different transactions. We can give little weight to the testimony that defendant's officers did not know that any of plaintiff's goods were used in these last two transactions for the reason the chattel mortgage in each instance specifies the objects it covers and clearly shows the parts thereof owned by plaintiff and so names them.

That defendant had knowledge that plaintiff was expecting to be paid the money due it out of each transaction and that plaintiff's contract with Harrelson called for that to be done, cannot be doubted. After the first four sales were made, plaintiff demanded of defendant that it pay, as per plaintiff's contract with Harrelson, and defendant did pay. The reason it paid, out of what funds and at whose request are all immaterial. The fact is it was informed, if it did not already know, just what plaintiff expected to be done in those transactions, as well as all future ones, and with this knowledge in mind, the two transactions sued on here were made.

In order that it might be thoroughly understood how plaintiff's money got into defendant's hands, it is necessary to state the manner in which the deals were handled: Harrelson would bid on a completed job of refrigeration, and this included installation. To complete the job he would often, as in the case here, use plaintiff's goods, also defendant's motors and other materials, and possibly some of his own. On the goods used belonging to defendant, there was a definitely fixed price. When the job was completed, the chattel mortgage and notes were prepared and executed. Harrelson and defendant would endorse the notes and defendant's officer would present them all to the Motors Finance Company which financed the deal. The connection with the Motors Finance Company was effected through defendant who attended to this part of the deal, and the money was all paid into defendant's hands. It would credit itself with the price of the motors and other materials used and furnished by it and credit Harrelson's account with the remainder. In the two transactions involved in this suit, after crediting itself with the amount due for the motors, etc., furnished by it, it then credited the balance to the amount due it by Harrelson, on either open account or note. Harrelson gave defendant no authority to credit him with the amount due plaintiff for its goods and wares used and sold in the job and for which he had contracted to pay plaintiff immediately after sale thereof.

We are sure defendant was without right in law to appropriate this money and apply it to Harrelson's indebtedness, with the knowledge it had of the contract existing

between Harrelson and plaintiff. The money was not Harrelson's but belonged to plaintiff.

Article 2138 of the Revised Civil Code, which is invoked by defendant, has no application to the facts as found by us.

The amount due plaintiff out of the two last deals is the amount sued for here and defendant has appropriated it to its own use without right in law. The money belongs to plaintiff and it is entitled to judgment against defendant for it.

The judgment of the lower court is erroneous and it is now reversed, and there is judgment for plaintiff against defendant in the sum of $1,649.89, with legal interest thereon from judicial demand until paid, and for all costs of this suit.